RECEIVED

JAN - 9 2020

U.S. District Court
Eastern District of MO

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* Joanne Waters  Plaintiff,  v.  ST. LOUIS PATHOLOGY ASSOCIATES INC., ST. LOUIS CLINCICAL PATHOLOGY LLC, ST. JOHN'S MERCY HOSPITAL SYSTEM, PHYSICIAN DATA MANAGEMENT LLC, and UNITEDHEALTH GROUP, INC.  Defendants. | **4:20-cv-00037-SEP**  JURY TRIAL DEMANDED |

## **VERIFIED COMPLAINT**

Plaintiff, brought on behalf of the United States of America by Joanne Waters

("Relator"), for its Complaint against Defendants St. Louis Pathology Associates, Inc. ("SLPA"),

St. Louis Clinical Pathology, LLC ("SLCP"), Physician Data Management, LLC ("PDM"), St.

John's Mercy Hospital System ("SJMHS"), and UnitedHealth Group, Inc. ("UHG") (SLPA,

SLCP, PDM, SJMHS, and UHG collectively are "Defendants") hereby states as follows:

## **THE PARTIES**

1.     Relator brings this action on behalf of the United States of America against

Defendants for treble damages and civil penalties arising from Defendants' false statements and

false claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* The violations

arise out of false and improper billing and patient record practices on claims paid by Medicare,

Medicaid, Tricare, and other Government Payors for services provided by SLPA.

2.     As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), Relator has

provided to the Attorney General of the United States and to the United States Attorney for the

1

Eastern District of Missouri a statement of all material evidence and information related to the complaint. This disclosure statement is supported by material evidence known to Relator at the time of filing, establishing the existence of Defendant's false claims. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and the United States Attorney in their capacity as potential co-counsel in the litigation, Relator understands this disclosure to be confidential.

3.      Relator is a citizen of the United States and resident of the State of Tennessee.

4.      Relator brings this action based on her direct, independent, and personal knowledge, and also, on information and belief.

5.      Relator is an original source of this information to the United States. She has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government included in this action under the False Claims Act, which is based on this information.

6.      Relator was the Practice Administrator for SLPA from on or around October of 2017 to on or around March of 2019.

7.      SLPA is incorporated in the state of Missouri with its principal place of business located at 660 Office Pkwy, St. Louis, MO 63141. SLPA provides clinical and anatomic pathology services to SJMHS patients pursuant to a contract with SJMHS.

8.      SJMHS is a Missouri nonprofit healthcare corporation headquartered at 14528 S. Outer Forty Rd., Chesterfield, MO 63017 and maintains multiple service locations throughout the state of Missouri. St. John's Mercy Medical Center is located at 615 S. New Ballas Road, St. Louis, MO 63141 and provides inpatient and outpatient hospital services. Mercy Hospital Washington is located at 901 E. Fifth Street, Washington, MO 63090 and provides inpatient and

2

outpatient hospital services. Mercy Outpatient Surgery Center – Clayton-Clarkson is located at 15945 Clayton Rd, Ballwin, MO 63011 and provides outpatient services. Mercy Hospital Lincoln is located at 1000 E. Cherry Street, Troy, MO 63379 and provides inpatient and outpatient services.

9.      PDM is a Missouri limited liability company with a corporate office at 9246 Watson Rd, Crestwood, MO 63126. PDM provides billing and collection services for SLCP pursuant to a contract between the two parties.

10.     SLCP is a Missouri limited liability company. SLCP receives mail and claims correspondence at 615 S. New Ballas Road, St. Louis, MO 63141. Mail is received in the department of pathology at SJMHS Saint Louis and billing correspondence is delivered to 660 Office Pkwy, St. Louis, MO 63141 by SJMHS courier multiple times per week. Billing correspondence is then redirected to PDM offices at 9246 Watson Road, Crestwood, MO 63126 for resolution.

11.     SLPA employs or contracts with pathologists that provide services to SJMHS patients in multiple locations, including: (1) Inpatient Mercy; St. John's Mercy Medical Center located at 615 S. New Ballas Road, St. Louis, MO 63141; Mercy Hospital Lincoln, 1000 E. Cherry Street, Troy, MO  63379 (2) Outpatient Mercy; St. John's Mercy Medical Center located at 615 S. New Ballas Road, St. Louis, MO 63141; Mercy Hospital Lincoln, 1000 E. Cherry Street, Troy, MO 63379 (3) Inpatient Mercy Washington; Mercy Hospital Washington is located at 901 E. Fifth Street, Washington, MO 63090 (4) Outpatient Mercy Washington; Mercy Hospital Washington is located at 901 E. Fifth Street, Washington, MO 63090, and (5) Outpatient Ambulatory Surgery Center at 15945 Clayton Rd, Ballwin, MO.

3

12.     UHG is a managed health care company with its headquarters in Minnetonka, Minnesota, which provides patients with Medicare coverage through Medicare Advantage Plans. UHG maintains a regional office at 13655 Riverport Dr., Maryland Heights, MO 63043.

13.     SLPA is a corporate organization of physicians who specialize in providing clinical diagnostic laboratory services and anatomic pathology services.

14.     SLPA submits claims for payments for clinical diagnostic laboratory services and anatomic pathology services on behalf of SJMHS for services performed by SLPA-employed physicians at SJMHS facilities.

15.     SLCP is a legally separate entity from SLPA. SLPA employed physicians own and operate SLCP, which has no employees of its own. SLCP submits claims primarily on an out-of-network billing basis on behalf of SLPA for clinical pathology services performed at SJMHS facilities. SLPA submits claims primarily on an in-network billing basis on behalf of SLPA for clinical pathology services performed at SJMHS facilities.

16.     PDM is a contractor of SLCP for medical claim billing and collection services and submits claims to insurance providers, including Government payors, on behalf of SLCP. PDM did all of the medical claim billing for SLCP.

## BACKGROUND

17.     SLPA physicians who had not undergone the proper credentialing process necessary to legally be reimbursed for their services by Government Payors[1] provided Clinical and Anatomic Pathology services to patients covered by Government Payors.

---

[1] As used herein, "Government Payors" shall mean Medicare; Medicaid; Tricare; and private carriers who provide, or have provided, and/or administer, or have administered, insurance plans on behalf of, and/or reimbursed by, Medicare, Medicaid, or Tricare.

18.     SLPA and PDM then falsified the billing records for those services for which they would otherwise not be entitled to receive compensation by using the National Provider Identifier/Unique Physician Identification Numbers ("NPI"/"UPIN") of Credentialed Physicians[2].

19.     SJMHS acted with reckless disregard for the truth or falsity of these billing records by refusing to update its electronic health records interface to correct or prevent such fraudulent billing.

20.     Interfaces managed by SJMHS for billing used by both SLPA and PDM did not include service providers. SJMHS did not correct the SLPA or PDM interfaces to add service providers.

21.     SJMHS also failed to delete charges by SLPA and PDM from interfaces for which only SJMHS was authorized to bill.

22.     SLPA then submitted these false records to Palmetto GBA ("PGBA"), the contractor for Part B Medicare services for Railroad beneficiaries ("RRB"). SJMHS, SLCP, SLPA, and PDM also submitted the false records to Wisconsin Physicians Service Government Health Administrators ("WPS"), which is the Part A/B Medicare Administrative Contractor ("MAC") for Jurisdiction 5, which serves Missouri, as well as other Medicare contractors outside the state of Missouri.

23.     SLPA also submitted false records to Health Net Federal Services, LLC ("HNFS"), Humana Military Healthcare Services, Inc. ("HMH"), and other commercial carrier

---

[2] As used herein "Credentialed Physicians" means those physicians who underwent the process to become credentialed to properly receive reimbursement by Government Payors. Physicians who had not undergone that process are "Uncredentialed Physicians."

managed care plan providers who have contracted or are currently contracting with the Government to provide Tricare in Missouri.

24.     In reliance on those false records, PGBA paid SLPA and WPS paid SLCP, SLPA, and PDM for clinical and anatomic pathology services with money received from Medicare. HNFS, UHG, and HMH also paid SLPA for clinical and anatomic pathology services with money received from Tricare.

25.     UHG falsified billing records for services provided to its Medicare patients by using the Taxpayer Identification Numbers ("TIN") of SLPA and SLCP as the primary identifier for reimbursement and payment of claims without regard to the NPI for Uncredentialed Physicians.

26.     UHG then submitted these falsified records to WPS.

27.     WPS paid UHG with money received from Medicare.

28.     UHG then paid SLPA, SLCP, and/or PDM with money received from WPS.

29.     SLPA and PDM also submitted false claims for payment to the Missouri HealthNet Division of the Department of Social Services ("MO HealthNet"), the Medicaid program in Missouri, as well as other Medicaid programs located in states other than Missouri.

30.     The Department of Social Services is officially designated as the single state agency charged with the administration of the Missouri Medicaid program. http://dss.mo.gov/mhd/general/pages/about.htm.

31.     Based on the false records, MO HealthNet and Medicaid programs located in states outside of Missouri paid SLPA and SLCP. PDM received payment for services from an SLCP bank account which received reimbursements from insurance companies and patients for claims billed

6

32.     SLCP, SLPA, and PDM violated the False Claims Act by directly billing, or causing to be directly billed, Government Payors, which resulted in double-billing of the Government for services that had already been paid for on claims submitted by SJMHS. SLCP, SLPA, and PDM violated the False Claims Act by directly billing, or causing to be directly billed, Government Payors for services that were not provided or documented or permitted to be billed by a hospital-based pathologist without independent lab ownership.

33.     In multiple instances, both SLPA and PDM billed for services billed by SJMHS, including services with the same Technical Component ("TC") billed by SJMHS. In addition to issues with double billing caused by such practices, per regulations, because SLPA was not an independent laboratory, only SJMHS was allowed to bill for such procedures.

34.     SLPA and PDM also utilized generic International Classification of Diseases Tenth Edition ("ICD-10") diagnosis codes that did not correspond to the patients' actual diagnosis to get claims paid. Staff would assign and switch ICD-10 codes as claims were denied to ICD-10 codes that would result in reimbursement in a "trial-and-error" process to get claims paid. Pathologists did not assign or review the ICD-10 codes.

## JURISDICTION AND VENUE

35.     This action arises under the False Claims Act, 31 U.S.C. § 3729. This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1331.

36.     This Court has personal jurisdiction over SLPA, SLCP, PDM, and SJMHS because they are incorporated or organized under the laws of the State of Missouri.

37.     This Court has personal jurisdiction over UHG because it purposefully availed itself of the State of Missouri by operating an office here and employing Missouri residents. In

7

addition, several of the illegal acts complained of herein were directed by employees of UHG working in Missouri.

38.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein took place in this District, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transact and transacted business in this District.

## THE FALSE CLAIMS ACT

39.    The False Claims Act ("FCA") 31 U.S.C. § 3729 *et seq.* provides, in pertinent part:

> (a) Any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

40.    For the purposes of the FCA, "person," includes corporations. *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 125 (2003).

41.    There are four elements that must be proven to succeed in a qui tam action under § 3729(a)(1)(A): (1) a false statement or fraudulent course of conduct; (2) that was made or

carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money. *U.S. ex rel. Johnson v. Kaner Medical Group, P.A.*, 641 Fed. Appx. 391, 394 (5th Cir. 2016).

42.     "Material," within the context of the FCA, means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 42 U.S.C. § 3729(b)(4).

43.     Factual falsity is established when the claim involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided. *U.S. v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010).

44.     A claim may be false if it falsely certifies compliance with an applicable statute, regulation, or contract, and false certifications can be either express or implied. *U.S. v. Dynamic Visions, Inc.*, 216 F. Supp. 3d 1, 14 (D.D.C. 2016).

45.     A claim is false or fraudulent on the basis of implied certification when noncompliance with regulations is material to the Government's decision to reimburse the claims. See *Universal Health Servs., Inc. v. U.S.*, 136 S. Ct. 1989, 1996 (2016).

## THE ANTI-KICKBACK STATUTE

46.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), was born of Congressional concern that the health of patients was being adversely affected by payoffs in exchange for referring patients for medical services. These "kickbacks," already unlawful in some jurisdictions prior to enactment of the statute, increased costs for federally-funded healthcare programs and had long been regarded by professional organizations as unethical. H.R. Rep. No. 92-231, at 5093 (1972).

47.     To address the problem, Congress crafted criminal penalties for individuals or entities who knowingly and willfully solicited or received any renumeration in return for

9

referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1)(A). Reflecting Congress's grave concern with the serious issue of unethical kickbacks, the criminal penalties are severe: up to $100,000 in fines and/or imprisonment for up to ten years. *Id*. § 1320a-7b(b)(1).

48.     In addition to the criminal penalties provided for violation of the Anti-Kickback Statute, Congress recently amended the statute to classify claims that include items or services resulting from a violation of the statute as false or fraudulent for the purposes of the FCA. *Id.* § 1320a-7b(g).

## FACTS COMMON TO ALL COUNTS

### A. Medicare

49.     The Medicare program was created in 1965 as part of the Social Security Act, 42 U.S.C. § 1395 *et seq*., to provide a federally funded insurance program for the aged and disabled.

50.     During the relevant time period, the United States administered and funded Medicare, pursuant to the Social Security Act. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicare. In order to receive Medicare funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

51.     The Centers for Medicare and Medicaid Services ("CMS") is an agency of the United States Department of Health and Human Services ("HHS") and is responsible for the administration of the Medicare Program.

52.     Medicare consists of two basic parts: Part A (42 U.S.C. §§ 1395c-13951-5) and Part B (42 U.S.C. §§ 1395J-1395w-4). 42 U.S.C. § 1395 *et seq*. Medicare Part A covers a variety of inpatient services, including Surgical and Anatomic Pathology. Medicare Part B covers medically necessary services for diagnosis and treatment, including clinical pathology.

53.     MACs are private healthcare insurers that have been awarded a contract by CMS to process Medicare Part A and Part B medical claims in a specified geographic jurisdiction. The contractor for Missouri is WPS. PGBA is the contractor for Railroad Medicare Part B services.

54.     WPS processes Medicare claims and oversees provider enrollment for the state of Missouri pursuant to its MAC contract with CMS.

55.     A Diagnosis Related Group ("DRG") is a classification of inpatient hospital discharges established by CMS. 42 C.F.R. § 412.60(a). Patients who have similar clinical profiles and treatment costs are assigned to the same DRG. The DRG specifies a fixed payment for patient services based on the average treatment costs of patients within the DRG. CMS assigns, for each DRG, an appropriate weighting factor that reflects the estimated relative cost of hospital resources used with respect to discharges classified within that group compared to discharges classified within other groups. 42 C.F.R. § 412.60(b).

56.     When submitting claims to Medicare, the hospital includes the DRG on claims forms and then Medicare uses the DRG to determine the compensation paid to the hospital for the services provided.

57.     Medicare reimburses professional components of clinical pathology services provided to Medicare patients through Medicare Part A DRG payments to hospitals instead of through direct payments by Medicare Part B to the pathologists. The Medicare Part A reimbursements account for professional component services in the DRG calculations.

11

58.     The professional components of clinical pathology services are critical to the diagnosis and treatment of patients and these services can only be performed by credentialed physicians. These services include setting up test protocols, calibrating equipment and supervising testing, interpreting results, and consulting with treating physicians.

59.     Professional component services for clinical pathology services are covered under Medicare Part A and therefore compensation must be paid to physicians by the hospital at fair market value for the services.

60.     Medicare Advantage Plans are offered by private companies that contract with Medicare and these types of plans fall under Medicare Part C. These plans cover all Part A and Part B benefits. Medicare Advantage Plans include: Health Maintenance Organizations ("HMOs"), Preferred Provider Organizations ("PPOs"), and Private Fee-for-Service Plans.

**B. Medicaid**

61.     Title XVIII of the Social Security Act, 42 U.S.C. § 1396, *et seq*. establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels for services, and administrative and operational procedures.

62.     During the relevant time period, the United States provided funds to the Missouri Medical Assistance Program (Medicaid) under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*. Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing claims for payment, and to keep and allow access to records and information as

12

required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State

63.     To become an enrolled Medicaid provider in Missouri, physicians must submit an application through the Missouri HealthNet Division of the Department of Social Services ("MO HealthNet"). The credentialing application has numerous parts, including, but not limited to, the Clinical Laboratory Improvement Act ("CLIA") identification number issued to the practice location of enrollment, the physician's Medicare Provider Number, the TIN, the physician's NPI, the physician's financial information, the physician's employment information, and the physician's contact information.

64.     Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

C. **Tricare**

65.     During the relevant time period, the United States administered and funded the Civilian Health and Medical Program of the Uniformed Services (formerly known as Champus and now called the Tricare program). Tricare provides medical and dental care to members and certain former members of the uniformed services and their dependents, 10 U.S.C. § 1071 *et seq*. By becoming a participating provider in Tricare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing claims for payment, and to keep and allow access to records and information as required by Tricare. In order to receive Tricare funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all Tricare regulations, and all applicable policies and procedures issued by the State.

13

66.     Tricare is managed by the Defense Health Agency ("DHA"), which assumed this responsibility on October 1, 2013.

67.     The DHA contracts with private insurers to process Tricare claims for a specified geographic area.

68.     Tricare was divided into three regions in 2004. Tricare North included the area covering St. Louis, Missouri. Tricare West covered the rest of the Missouri area.

69.     Before January 1, 2018, Health Net Federal Services, LLC ("HNFS") was responsible for administration of Tricare services in the North region covering St. Louis. Before January 1, 2018, UHG was responsible for administration of Tricare services in the West region covering the rest of Missouri.

70.     On January 1, 2018, Tricare was reconfigured into two regions, Tricare East and Tricare West. Humana Military Healthcare Services, Inc. ("HMH") is responsible for administration of Tricare services in the East region covering the St. Louis area. HNFS is responsible for administration of Tricare services in the West region covering the rest of Missouri.

**D. <u>Background of the Businesses</u>**

71.     On October 1, 2001, SLPA entered into a contract with SJMHS to provide SJMHS with medical directorship and professional clinical and pathology services.

72.     SLPA physicians rendered services at SJMHS facilities.

73.     SLCP is owned by physicians employed by SLPA. SLCP provides primarily out-of-network billing services for clinical pathology services provided at SJMHS facilities by SLPA.

14

74.     PDM is a contractor of SLCP for medical claim billing and collection services.
This includes billing to Government Payors by PDM on behalf of SLCP. PDM did all of SLCP's
billing.

75.     SLPA and SLCP are not independent labs.

76.     SLCP was created to bill for certain procedures for which SLPA would otherwise
not be allowed to bill or receive reimbursement. On information and belief, these services were
billed on an out-of-network basis to patients and to Government Payors by PDM at the direction
of SLPA physicians.

77.     UHG offers multiple Medicare Advantage Plans. UHG offers both HMO and PPO
plans to its members.

78.     UHG is obligated to require providers it reimburses to become Credentialed
Physicians in order to provide Medicare Advantage Plan covered services through those
providers. Providers must submit an application with information sufficient to meet the
credentialing requirements. The credentialing requirements include: (1) A practitioner degree,
post-graduate education or training, details of medical or professional education and training, and
completion of residency in the designated specialty; (2) A current license or certification in the
state(s) in which the provider will be practicing, the physician's NPI, the physician's Active
Drug Enforcement Agency number and/or Controlled Substance (CDS) certificate or acceptable
substitute, and Medicare/Medicaid participation eligibility or certification; (3) Five-year work
history and explanations if there are gaps longer than 6 months, statements of work limitations,
license history and sanctions, a W-9 form, and the physician's hospital staff privileges; (4)
Possession of active errors and omissions insurance or a state-approved alternative and
malpractice history; and (5) Other credentialing requirements such as the physician's AMA

15

profile or criminal history review as required, a passing score on a state site visit, and notification if the provider has ever been a delegated provider prior to the credentialing application.

**E. Uncredentialed physicians fraudulently claimed reimbursements for care**

79.    S.A.M., MD ("Dr. M.") was the President of SLPA until July 2017, at which time Dr. P.H. ("Dr. H.") became President. Dr. M.D.P. ("Dr. P.") became president after Dr. H. resigned in May 2018.

80.    Some Uncredentialed Physicians employed by SLPA provided services to patients who received insurance through Government Payors.

81.    The majority of physicians employed by SLPA were Uncredentialed Physicians. Rather than submit claims by Uncredentialed Physicians to Government payors, which would be rejected, claims were submitted under the NPIs of Drs. M. and H., who were Credentialed Physicians, even when they were not the physicians who had provided the services.

82.    For example, during August and September of 2018, Dr. J.K. ("Dr. K.") submitted claims to Medicare for work he performed under his own NPI. Medicare denied reimbursement because Dr. K. was not a properly credentialed Medicare provider.

83.    Dr. H. and Dr. P. then instructed Credentialed Physicians at the practice to rebill Dr. K.'s work under their own NPIs.

84.    UHG instructed pathologists to submit claims forms without regard to credentialing.

85.    In addition, multiple pathologists at SLPA's facilities had not undergone the process of Medicaid credentialing or revalidation in Missouri over a twenty-year period. Defendants submitted claims primarily under only one pathologist who had completed the requisite credentialing process with Medicaid. The overwhelming majority of all of the services

16

billed and paid for by Medicaid were rendered by other pathologists. Thousands of claims were billed under a non-rendering pathologist and inaccurate NPI number.

**F.     Billing by trial and error**

86.     Under Medicare Part B, reimbursement for physician and ancillary services is secured through a coding system known as the Current Procedural Terminology System ("CPT"). Under this system a CPT code is assigned to each particular service or procedure provided to a patient. Each CPT code is supported by an International Classification of Diseases Tenth Edition ("ICD-10") diagnosis code.

87.     Healthcare providers utilize CPT codes when billing federally funded healthcare programs to tell the payor what level of service has been rendered.

88.     SLPA, PDM, and SJMHS changed ICD-10 codes and CPT codes after Medicare rejected claims for reimbursement to different codes until Medicare provided reimbursement in a process of "trial and error" claim billing.

## COUNT I

### Violation of False Claims Act § 3729 *et seq*.
### Billing for Services of Non-rendering and Uncredentialed Physicians Using NPIs of Credentialed Physicians

89.     Relator realleges and incorporates the allegations of paragraphs 1 through 88 as though fully set forth herein.

90.     The majority of all of SLPA and SLCP's claims were submitted to Government Payors under the NPIs of Drs. M. and H. when the services were actually performed by other doctors.

91.     To illustrate, Dr. M. received $7,673 from Medicaid, $6,236 from Medicare, $71,699 from PPO plans, and $18,730 from HMOs, such as those provided by Medicare through UHG, for Level IV pathology exams provided at location 1 during this time period. (Ex. A. 83).

17

92.     Dr. H. received $2,209 from Medicaid, $2,886 from Medicare, $18,800 from PPO plans, such as those provided by Medicare through UHG, and $6,206 from HMOs, such as those provided by Medicare through UHG, for Level IV pathology exams provided at location 1 during this time period. (*Id.* 39).

93.     By contrast, Dr. J.L. ("Dr. L.") received $3,019 (*Id.* 2), Dr. P.C. ("Dr. C.") received $301 (*Id.* 6), Dr. G.L. received $1,635 (*Id.* 10), Dr. A.M. received $0 (*Id.* 14), Dr. C.J. received $1,359 (*Id.* 15), Dr. S.M. received $3,543 (*Id.* 19), Dr. L.G. received $605, (*Id.* 24-25), Dr. P. received $3,144 (*Id.* 29), Dr. J.H. received $2,579 (*Id.* 34), Dr. B.O. received $1,979 (*Id.* 47), Dr. E.S. received $901 (*Id.* 52), Dr. X.H. received $1,079 (*Id.* 66), and Dr. A.F. received $763 (*Id.* 69) from Medicare for Level IV pathology exams at location 1 for the same time period. Almost none of these providers received any payments from other insurance carriers but Medicare and the payments they did receive from Medicare were disproportionately less than that of Dr. M. and Dr. H..

94.     Dr. M. received $6,903 from Medicare, $28,732 from Medicaid, $125,721 from PPOs, and $47,106 from HMOs for Level V Pathology Exams provided at location 1 during the year 2016. (*Id.* 83).

95.     By contrast, Dr. L. received $2,012 from Medicare only (*Id.* 2), Dr. C.J. received $1,114 from Medicare only (*Id.* 15), Dr. L.G. received $483 from Medicare only (*Id.* 25), Dr. P. received $2,499 from Medicare only (*Id.* 29), Dr. J.H. received $2,501 from Medicare only (*Id.* 34), Dr. E.S. received $81 from Medicare only (*Id.* 52), Dr. A.A. received $5,497 from Medicare only (*Id.* 57), Dr. M.M. received $2,658 from Medicare only (*Id.* 61), Dr. X.H. received $1,079 from Medicare only (*Id.* 66), and Dr. A.F. received $1,553 from Medicare only (*Id.* 69) for Level V Pathology Exams provided at location 1 for 2016.

96.     Dr. M. and Dr. H. received the vast majority of payments from other commercial carriers for the year 2016. (See Ex. A.). Because commercial carriers, like UHG, have contracts with the government to provide Medicare Advantage plans, there is even more billing to Government Payors under Dr. M.'s and Dr. H.'s NPIs when they were not the rendering providers than is reflected in the Exhibit A report.

97.     From January 1, 2017, to October 31, 2017, billing was done under the NPI of Dr. H. for services performed by other doctors. Similar billing patterns occurred to those seen in Exhibit A.

98.     Dr. H. received $30,040.97 from Medicaid, $5,541.93 from Medicare, $137,980.91 from PPOs, and $14,447.23 from HMOs for Level IV exams at location 1 for this time period. (Ex. B. 33). Dr. H. received $6,048.61 from Medicaid and $5,495 from Medicare for Level IV exams at location 2 for this time period. (*Id*. 42). By contrast, Dr. E.S. received just $12.90 from Medicare for Level IV exams at location 2 during the same time period. (*Id*. 60). She received no payments from Medicaid, PPOs, or HMOs for these services. Dr. A.A. received $3,723.77 from Medicare for Level IV exams at location 1 during the same time period. (*Id*. 64). She received no payments from Medicaid, PPOs, or HMOs for these services. Dr. G.L. received $1,166.08 from Medicare for Level IV exams at location 1 during the same time period. (*Id*. 9). She received no payments from Medicaid during this time period. Dr. M.M. received $1,841 from Medicare only for Level IV exams at location 1 during this time period. (*Id*. 68). Dr. A.F. received $2,983.80 from Medicare only for Level IV exams at location 1 during this time period. (*Id*. 78). Dr. J.K. received $3,685.03 from Medicare only for Level IV exams at location 1 during this time period. (*Id*. 84).

99. The disparity in billing between Drs. M. and H. and the rest of SLPA's physicians demonstrates the use of Drs. M. and H.'s NPIs by other physicians in violation of § 3729 *et. seq.* The level of work that Drs. M. and H. claim to have performed is impossible for one person to do. By utilizing the NPI numbers of Drs. M. and H., other SLPA physicians received reimbursement for procedures for which they would not otherwise be entitled to reimbursement due to their lack of credentials.

100. SLPA and PDM knowingly falsified records by affixing the NPI/UPIN of physicians who did not render the pathology services to claims forms during at least the years 2013–2018. PDM (on behalf of SLCP) and SLPA then presented the altered and false claims forms to WPS, PGBA, MO HealthNet, HNFS, HMH, and UHG.

101. WPS, PGBA, MO HealthNet, HNFS, and HMH, unaware of the falsity of the claims and/or statements, made or caused to be made by SJMHS, SLPA, SLCP, and PDM, paid and may continue to pay reimbursements for services provided by non-rendering and/or Uncredentialed Physicians. On information and belief, UHG was aware that these claims forms were falsified, or reasonably should have been aware that the forms were falsified. In addition, Defendants' process of trial and error billing, as discussed above, violated the FCA.

102. As a result of Defendants' actions, the U.S. Government paid to Defendants money to which Defendants were not entitled under the law.

103. As a result of Defendants' actions, the U.S. was severely damaged and will continue to be severely damaged.

## COUNT II

### Violation of False Claims Act § 3729 *et. seq.*
### Billing Medicare and Other Government Carriers Using Group TINs and UPINs/NPIs of Non-rendering and/or Uncredentialed Physicians

20

104.     Relator realleges and incorporates the allegations of paragraphs 1 through 103 as though fully set forth herein.

105.     Relator contacted the Missouri regional representative for UHG, T.V., to see if credentialing of physicians could be expedited. T.V. informed Relator that UHG reimbursed by TIN, not by NPI.

106.     T.V. instructed Relator to submit billing claims forms using the TIN of SLPA and the NPI of Uncredentialed Physicians.

107.     T.V. also told relator that using TINs while physicians were either uncredentialed or in the process of becoming credentialed was "standard practice" and that this is "done all over the country." Relator told the UHG representative that this was non-compliant with CMS regulations, but SLPA, PDM, and UHG submitted billing records using TINs regardless of these concerns.

108.     SLPA and PDM affixed the TIN to the claims forms submitted on behalf of Uncredentialed Physicians and submitted these falsified records to UHG. UHG knew that these records were false because it instructed SLPA that it reimbursed based on the TIN, not the NPI.

109.     UHG then presented these false claims to Government Payors, which, in reliance on the accuracy of the forms, paid UHG for pathology services.

110.     As a result of UHG's actions, the U.S. Government paid Defendants when they were not entitled to receive these payments.

111.     As a result of UHG's actions, the U.S. was severely damaged and will continue to be severely damaged.

## COUNT III

### Violation of False Claims Act § 3729 *et. seq.*
### Double Billing

112.     Relator realleges and incorporates the allegations of paragraphs 1 through 111 as though fully set forth herein.

113.     PDM (at the direction of SLCP) and SLPA billed Government Payors for pathologist services directly.

114.     In some instances, billing and payment by Medicare for these pathological services was already accounted for by claims forms submitted by SJMHS to Medicare.

115.     As a result of SLPA and PDM's actions in directly billing Government Payors, the Government was double-billed, or even triple-billed, for those services, in violation of 31 U.S.C. § 3729.

116.     As a result of SLPA, SLCP, PDM, and SJMHS's actions, the U.S. was severely damaged and will continue to be severely damaged.

### COUNT IV

### Violation of False Claims Act § 3729 *et. seq.*
### Violation of the Anti-Kickback Statute

117.     Relator realleges and incorporates the allegations of paragraphs 1 through 116 as though fully set forth herein.

118.     SLPA used SLCP to bill for claims for which SLPA was not entitled to receive payment. On information and belief, at least some of this billing was directed to Government Payors.

119.     PDM would take a percentage of the money it recovered on behalf of SLCP in exchange for its services. SLCP would take the remaining money, less PDM's percentage fee, and transfer it to SLPA.

120.     SLPA pathologists represented themselves as employed by either SLPA or SLCP for billing and collection purposes depending on the ability of each firm to receive

22

reimbursement by the Government. For example, if SLPA could bill for Procedure *x* but not Procedure *y*, SLPA would bill for Procedure *x* and SLCP, on behalf of SLPA, and without disclosing to the patient that it was operating on behalf of SLPA, would bill for Procedure *y*. In this manner, pathologists would "change hats" depending on the organization that could bill for a procedure.

121.    Because SLCP was not generating its own patients, pathologists, when acting on behalf of the shell organization SLCP were "referred" patients from SLPA who were sent by SJMHS to SLPA for pathology services.

122.    In return for these "referrals" to SLCP for the furnishing of certain pathology services, SLPA was paid for services it was not entitled to bill for, resulting in renumeration it would not otherwise receive. SLPA knowingly engaged in these actions and willfully solicited the higher compensation from the renumeration in exchange for the referrals in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

123.    Because this claim involves services resulting from a violation of the Anti-Kickback Statute, it constitutes a false or fraudulent claim for the purposes of subchapter III of chapter 37 of Title 31 (the FCA). *Id.* § 1320a-7b(g).

124.    As a result of SLPA and SLCP's actions, the United States has been, and will continue to be severely damaged.

## COUNT V

### Conspiracy to Submit False Claims

125.    Relator realleges and incorporates the allegations of paragraphs 1 through 124 as though fully set forth herein.

23

126.    Defendants combined, conspired, and agreed together to defraud the U.S. Government by knowingly submitting false claims, for the purpose of getting the false or fraudulent claims paid or allowed, and committed other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(1)(C).

127.    Defendants unlawfully agreed to act, or knowingly acted in concert with an implied agreement, in furtherance of receiving payment on false or fraudulent claims from the U.S. Government and performed at least one act in furtherance of said agreement.

128.    As a result of Defendants' actions, the United States has been, and will continue to be severely damaged.

### PRAYER FOR RELIEF

WHEREFORE, Relator respectfully asks this Court to enter judgment against SJMHS, SLPA, SLCP, PDM, and UHG in accordance with the following:

(a) That Defendants be ordered to cease and desist from submitting and/or causing to be submitted any additional false claims or otherwise violating 31 U.S.C. §§ 3729 *et seq.*;

(b) That civil penalties be imposed of not less than Five Thousand ($5,000.00) Dollars nor more than Ten Thousand ($10,000.00) Dollars for each and every false claim presented to the United States, multiplied as provided by 31 U.S.C. §§ 3729 *et seq.*;

(c) That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

(d) That judgment be entered for Relator and against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees, costs, and expenses for which Relator necessarily incurred in bringing this case;

24

(e) That pre- and post-judgment interests be awarded;

(f) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this complaint; and

(g) For such other and further relief as the Court deems just and proper under the circumstances.

## **Verification**

     I, Joanne Waters, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. This verification is made pursuant to 28 U.S.C. § 1746.

     Executed this 2nd day of Jun , 2020

_____
Joanne Waters, Relator

Dated: January 9, 2020

Respectfully submitted,

/s/ *Anthony G. Simon*
Anthony G. Simon, #38745
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
St. Louis, Missouri 63101
P. (314) 241-2929
Fax (314) 241-2029
asimon@simonlawpc.com

*Attorney for Plaintiffs*